*AMD
Apr. 1, 2014*



**U.S. Department of Justice**

*United States Attorney
District of Maryland*

*Sandra Wilkinson
Chief, Major Crimes
Sandra.Wilkinson@usdoj.gov*

*Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119*

*DIRECT: 410-209-4921
MAIN: 410-209-4800
FAX: 410-962-0716*

April 1, 2014

Steven R. Freeman
Craig M. Schwartz
Freeman, Wolfe & Greenbaum
PNC Bank-Towson Building, Suite 300
409 Washington Avenue
Towson, MD 21204

*Rejected*

*4/28/14*

Re:     United States v. Saleh Fakhoury (to be assigned)

Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by April 4, 2014, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to waive Indictment and plead guilty to a Criminal Information to be filed against him charging him with Conspiracy to Use Fire to Commit a Federal Felony, in violation of Title 18, United States Code, Section 844(m). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

        a.      That the defendant conspired and agreed with persons known and unknown to the Grand Jury to commit an offense under Title 18, United States Code, Section 844(h)(1);

        b.      That the object of the conspiracy was using fire to commit wire fraud, a felony prosecutable in a court of the United States.

1

c.      That wire fraud, in violation of Title 18, United States Code, Section 1343, is acting with the intent to defraud to devise a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises, and in furtherance of said scheme, the transmitting or causing the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

## Penalties

3.      The maximum sentence provided by statute for the offenses to which the Defendant is pleading guilty is as follows:  20 years' incarceration, a $250,000 fine, and up to three (3) years supervised release.  In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.  If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel.  That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      The Defendant has the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an indictment against him.  By agreeing to proceed by way of Information, he is giving up that right, and understands that the charges will be filed by the United States Attorney without the Grand Jury.

c.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.  Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

2

       d.     If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

       e.     The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

       f.     If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

       g.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

       h.     If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

       i.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

     5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

**Factual and Advisory Guidelines Stipulation**

6.   This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a.   Pursuant to U.S.S.G. § 2K1.4, the base offense level is **2** plus the offense level from U.S.S.G. § 2B1.1.

b.   Pursuant to U.S.S.G. §§ 2B1.1(a)(1) and (b)(1)(J), the base offense level is **7** and there is an eighteen (18) level increase because the attempted fraud loss was more than $2.5 million dollars (25 plus 2 = Subtotal 27).

c.   Pursuant to U.S.S.G. § 3C1.1, there is a two (2) level increase for obstruction of justice because the defendant committed, suborned and attempted to suborn perjury during the course of a civil proceeding pertaining to conduct that forms the basis of the offense of conviction. (Subtotal: 29).

7.   This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of your client's acceptance of personal responsibility for his conduct.  This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

8.   Thus, the adjusted offense level is 26.

9.   The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

10.   This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other specific offense characteristics set forth in the United States Sentencing Guidelines will be raised or are in dispute.  This Office and the Defendant further agree that both parties reserve the right to argue that this Court should sentence the Defendant to a variant sentence outside of the advisory guidelines range determined by the Court.  This Office and the Defendant stipulate and agree that if either party intends to argue, pursuant to 18 U.S.C. Section 3553(a), that the sentence in this case should fall outside of the advisory guidelines range based on any factor, that party will notify opposing counsel at least 14 days in advance of

4

sentencing of the facts or issues the party intends to raise. If the party seeking the non-guideline sentence fails to provide timely notice of the intent to argue for a sentence outside the advisory guidelines range, that party will withdraw the 3553(a) arguments or consent to a continuance of the sentencing date.

## Obligations of the United States Attorney's Office

11.  At the time of sentencing, this Office will recommend a reasonable sentence taking into consideration the adjusted U.S.S.G. level and the sentencing factors outlined at 18 U.S.C. § 3553(a).

12.  The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

## Civil Liability

13.  The Defendant and his wife, Nelly Fakhoury, will dismiss with prejudice the lawsuit filed against the victim insurance company in this case which is pending in this District as *Saleh Fakhoury, et al. v. Great Northern Insurance Company*, Case No.: 1:12-cv-00268-WDQ. The Defendant and his wife will also sign a general release, in a form to be prepared by Great Northern, releasing Great Northern Insurance Company and its parent(s), subsidiaries, affiliates, officers, directors, employees, and consultants from any and all claims arising out of the fire at defendant's house and/or the subsequent fire insurance claim filed with Great Northern Insurance Company.

14.  The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. As part of the defendant's restitution obligation, he and his wife shall exert their best efforts to accomplish a timely sale of the property at 11201 Greenspring Avenue, Lutherville, MD, 21093, on commercially reasonable terms. The Defendant upon entering his guilty plea, shall promptly list the aforementioned property for sale with a licensed real estate broker affiliated with the Multiple Listing Service (MLS). The terms of the listing agreement and any contract for sale of the property shall be subject to prior review and approval by Great Northern Insurance Company. The net proceeds of that sale shall be applied to reduce Defendant's restitution obligation under this plea agreement. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

5

## Collection of Financial Obligations

15. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

16. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

17. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

## Waiver of Appeal

18. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence in imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

e. The Defendant further waives any and all motions, defenses, probable cause determinations, objections which defendant could assert to the indictment or to the Court's entry of judgment against the Defendant, and any imposition of sentence upon the Defendant consistent with this agreement. If Defendant files a notice of appeal, notwithstanding this

6

agreement, Defendant agrees that this case shall be remanded to the district court to determine whether Defendant is in breach of this agreement and, if so, to permit the United States to withdraw from the plea agreement.

### Obstruction or Other Violations of Law

19.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) files a motion to withdraw his guilty plea, or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

20.     The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

21.      This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case.  The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____

Sandra Wilkinson
Judson T. Mihok
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it.  I am completely satisfied with the representation of my attorney.

4/7/14
Date                                Saleh Fakhoury

I am Mr. Fakhoury's attorney.  I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him.  He advises me that he understands and accepts its terms.  To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

4/7/14
Date                                Steven R. Freeman

8

**Attachment A**
**Statement of Facts**

*The undersigned parties hereby stipulate and agree that the following facts are true and accurate, and that if this matter had gone to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

Saleh (a/k/a "Sam") H. Fakhoury (SF), age 45, was a resident of Lutherville, Maryland. **FAKHOURY** is married to Nelly Fakhoury.

**FAKHOURY** and his wife purchased 11201 Greenspring Avenue, in Lutherville, Maryland, 21093 (hereinafter "the Maryland home") on or about November 29, 2000 for approximately $375,000. The Maryland home was the primary residence for **FAKHOURY** and his wife until approximately 2007.   On or about February 2, 2007, **FAKHOURY** and his wife purchased a home in Florida (hereinafter "the Florida home") for the purchase price of $660,394. The interest-only loan amount was $528,300 which was originally held by Homebanc Mortgage Corporation.  In July 2007, **FAKHOURY** and his wife, together with their minor son, moved to Florida and used the Florida home as their primary residence.

In May 2007, the Maryland home was appraised at $1,050,000. **FAKHOURY** and his wife refinanced the Maryland home for $630,000 out of which $419,493.35 was disbursed to them from the refinancing.  At the time of the fires in March of 2009, the Fakhourys owed more than $800,000 on the mortgage on the Maryland home.

By about March 2009, **FAKHOURY** and his wife were in debt to various unsecured creditors including credit cards, utilities and other service providers in an approximate amount of over $200,000.  In or about March 2009, **FAKHOURY** and his wife owed approximately $1.7 million dollars to various banks for the mortgages for the properties they owned.

The victim of the fraud is Great Northern Insurance Company (hereinafter "Great Northern"), an insurance company authorized to transact business in Maryland, said business being the sale of property and casualty insurance policies. Great Northern's insurance business is managed by Chubb & Son, a division of Federal Insurance Company (hereinafter "Chubb & Son").

At or about the time the Maryland home was purchased, **FAKHOURY** and his wife purchased a homeowner's insurance policy from Great Northern (hereinafter "insurance policy"). In November 2008, the insurance policy was for "deluxe coverage" in the amount of $1,554,000 (dwelling) and included "extended replacement cost."     According to the policy, "extended replacement cost" is defined as follows:  in the event of a covered loss, Great Northern would pay the reconstruction cost of the house even if the amount were greater than the amount of coverage for the house. The policy on the contents of the house was for "replacement cost" in

1

the amount $777,000.  According to the insurance policy, "replacement cost" is defined as follows: in the event of a covered loss, Chubb & Sons would pay the full cost to replace the contents without deduction for depreciation, or the amount required to repair the damage, whichever is less, up to the amount of the coverage.

The insurance policy excluded from coverage "any loss caused intentionally by [**FAKHOURY**] ....or by a person directed by [**FAKHOURY**]." According to the policy, "an intentional act is one whose consequences could have been foreseen by a reasonable person." A general condition of the insurance policy bars insurance coverage if the insured "or any covered person has intentionally concealed or misrepresented any material fact relating to [the] policy before or after a loss."

Under the insurance policy, the duties of the insured (**FAKHOURY**) after a loss were to provide "all available information", "prepare an inventory of damaged personal property describing the property in full" and "a sworn proof of loss providing all information and documentation" requested by Great Northern. All material representations provided to Great Northern by **FAKHOURY** must be complete and truthful.

At some time prior to March 2009, **FAKHOURY** and another individual referred to herein as H (who, at times, worked for **FAKHOURY**) devised a scheme to defraud Great Northern of money by causing the Maryland home to be deliberately destroyed by arson so that **FAKHOURY** could collect on the insurance proceeds and pay off debts he owed.  It was part of the scheme to defraud that the two men agreed to have the Maryland home set on fire. **FAKHOURY** and H then fraudulently concealed information from, and misrepresented information to, law enforcement about the fire. **FAKOURY** and H used and caused to be used interstate wires in order to communicate with one another about the fire and for **FAKHOURY** to communicate with Great Northern.  It was a further part of the scheme to defraud **FAKHOURY** would unlawfully benefit, and did unlawfully benefit, from the insurance policy on the Maryland home and H personally benefited through monies **FAKHOURY** paid him for having the house burned.

Beginning on or about March 6, 2009 and continuing through March 15, 2009, **FAKHOURY** and H were in regular contact via cellular telephone from Maryland (H's phone) to **FAKHOURY** in Florida.  The purpose of the contacts was, in part, to discuss the planned fire.

The investigation revealed that on or about March 12 or 13, 2009, a fire was deliberately set at the Maryland home at the request of **FAKHOURY** to H.  The fire self-extinguished and the property sustained minimal damage.  The fire was not reported to the local police or fire department.  on or about March 15, 2009, at some time prior to 4:09 a.m., a second fire was deliberately set using an ignitable liquid at the Maryland home.  The property was completely destroyed.  During a recorded conversation between **FAKHOURY** and H on January 23, 2014, the two men discussed the second fire that destroyed the home.  **FAKHOURY** told H "You made me really sick I wish you listened to me they didn't do it the second time" and H agreed. **FAKHOURY** was referring here to the fact that he and H discussed not following through with

2

the arson after the failed first attempt. Nevertheless, the second fire was deliberately set with the knowledge and complicity of both.

At approximately 11:55 a.m. on or about Friday, March 13, 2009, **FAKHOURY** called the claims center for Great Northern and stated in words or substance that his "contractor doing repairs has now discovered an electrical problem at his home."

At approximately 5:33 p.m. on or about March 15, 2009, **FAKHOURY** made an interstate call to Great Northern claim center and reported the second fire; thereby causing the claim center to create an e-loss claim to Great Northern.

To assist them in preparation and submission of a proof of loss to the Victim, **FAKHOURY** hired The Goodman-Gable-Gould Company/Adjusters International (hereinafter "GGG"), a public adjuster. **FAKHOURY** provided GGG with a detailed list of the personal items claimed to have been lost in the fire. **FAKHOURY** made materially false and fraudulent representations to GGG that he knew would be related to the Victim.

In or about September 2009, **FAKHOURY** and his wife executed a Sworn Proof of Loss for Contents and Structure (hereinafter "Proof of Loss") and provided it to Chubb & Son seeking $2,233,775.62 for the Maryland home ("dwelling") and $921,422.22 for the contents of the home. The Proof of Loss for Unscheduled Personal Property was subscribed and sworn by **FAKHOURY** and his wife on or about September 23, 2009. **FAKHOURY** swore that the personal property described in the Proof of Loss was "destroyed or damaged at time of said loss" and that "no attempt to deceive Great Northern Insurance Company, as to the extent of said loss, has in any manner been made." The sworn Proof of Loss, however, was materially false and fraudulent in several ways:

a)   **FAKHOURY** claimed items were destroyed or damaged in the March 15, 2009 fire when, in fact, the items were not consumed in fire and were found at the Florida home during the execution of a search warrant in December 2009.
b)   **FAKHOURY** attempted to deceive Great Northern as to the extent of said loss by inflating the number, quality and value of items destroyed or damaged in the fire.

On or about September 22, 2010, Great Northern denied the claim but paid approximately $828,773 to Chase Manhattan Bank, the mortgagor of the Maryland home, to the benefit of **FAKHOURY** and his wife.

On or about December 2, 2011, **FAKHOURY** and his wife filed a civil action against Great Northern in an effort to recover monies under the insurance policy and claiming over $3,000,000 in compensatory damages.

3

I have read this statement of facts and carefully reviewed it with my attorney.  I acknowledge that it is true and correct.

4/7/14
_____
Date

SALEH FAKHOURY
_____

4/7/14
_____
Date

Steven R. Freeman
_____

4